J-S58001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  D.M | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  N.S. | |
| | No. 805 MDA 2015 |

Appeal from the Dispositional Order April 15, 2015
in the Court of Common Pleas of Lancaster County
Juvenile Division at No(s).: CP-36-DP-0000231-2014

BEFORE:  GANTMAN, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED NOVEMBER 12, 2015**

N.S. (Mother) appeals from the order of the Court of Common Pleas of Lancaster County, entered April 15, 2015, that adjudicated her son, D.M. (Child), born in January of 2010, dependent, committed him to the care and custody of Lancaster County Children and Youth Social Service Agency (LCCY), and further ordered that Child's goal should be reunification with his long-time caregiver, A.S. (Maternal Aunt).  We affirm.

As of the April 14, 2015 adjudication and disposition hearing, Mother had given birth to nine children, none of whom were in her legal or physical custody.  (**See** N.T. Hearing, 4/14/15, at 15).  Philadelphia's Department of Human Services (DHS) had an extensive history with Mother that dated back

_____

[*] Retired Senior Judge assigned to the Superior Court.

to 2003 and included the placement of five of her children in DHS custody. (***See id.*** at 12, 50). The oldest two children were in the care of DHS when Mother's parental rights to them were terminated and they were adopted. (***See id.*** at 11). Mother's next three children, K., and twins A. and A. (the Twins), were adopted by Maternal Grandmother. (***See id.*** at 20-21, 54).

Mother gave birth to her sixth infant, Child, in January of 2010. Mother brought Child to Lancaster County sometime in 2011 to stay with Maternal Aunt, and asked Maternal Aunt to care for Child for only a few months. (***See id.*** at 6-7). Mother contacted Maternal Aunt periodically but the frequency of that contact was in dispute. (***See id.*** at 84). Mother's "few months" became three years.

On May 14, 2014, DHS contacted LCCY and requested a courtesy home visit with Maternal Aunt after learning that Child had been living with her and that she had been his primary caregiver for three years. (***See id.*** at 12). LCCY conducted a home visit with Maternal Aunt, confirmed that Child lived with her, and reported that they had no concerns. LCCY closed the matter. (***See id.***).

Thereafter Mother had three more children (C., A., and G.). In June of 2013, C. and A. entered kinship care with Paternal Niece. Mother had left C. with a friend and never returned. (***See id.*** at 55). DHS placed C. with Paternal Niece, who was identified as a kinship care resource. (***See id.*** at 22). Paternal Niece began caring for A. after Mother left A. at a daycare,

- 2 -

and Paternal Niece picked A. up at Mother's request when daycare personnel threatened to involve DHS. (**See id.** at 55).

DHS had no contact with Mother from the time C. and A. entered Paternal Niece's custody in June of 2013 until March of 2014, when Mother gave birth to G. (**See id.** at 71). Mother placed G. in Maternal Grandmother's care shortly after her birth. (**See id.** at 56). Ultimately, Maternal Grandmother was no longer able to care for G. or the Twins, and Paternal Niece began to care for them as well and informed the DHS caseworker of the change. (**See id.** at 70-71). In sum, five of Mother's children, C., A., G., and the Twins, remain in kinship care with Paternal Niece.

The Lancaster Police Department arrested Maternal Aunt on August 15, 2014. Child had spent three years of his life in Maternal Aunt's care at this point. Unable to locate Mother or to identify a father, LCCY placed Child in a temporary resource home. On August 18, 2014, following a Shelter Care hearing, LCCY obtained temporary physical and legal custody of Child. The adjudication and disposition hearing was initially scheduled for September 22, 2014, but was continued while LCCY attempted to locate Mother. D.R. (Father), who has a history of drug use and has failed to work with DHS, was reputed to be Child's father. He was ordered to submit to paternity testing but had not complied by the time of the hearing; nor has he contacted LCCY or participated in any of the hearings.

LCCY located Mother on November 20, 2014, just prior to the hearing scheduled for November 24, 2014. Mother participated via telephone, but would not provide the trial court with her current address. (*See id.* at 67). The trial court continued the matter at Mother's request.

DHS again had no contact with Mother from March of 2014 until late January of 2015. Mother did not attend any dependency hearings between June of 2013 and January of 2015. (*See id.* at 72). Mother had no contact with any of her children in DHS custody. In January of 2015, DHS provided Mother a Family Service Plan (FSP) with reunification goals despite Mother's lack of any interest in her children for nearly 18 months. (*See id.* at 57, 61). Mother's progress toward her FSP goals was inconsistent. (*See id.* at 57).

Mother failed to attend the subsequent hearing held on February 9, 2015, and the matter was once again continued. On February 17, 2015, the trial court continued the matter at the request of Mother, who had missed her train and arrived late. On March 17 2015, Mother participated by telephone, but the matter was continued due to a conflict of interest in her court-appointed representation.

The adjudication and disposition hearing was finally convened on April 14, 2015. Child was five-years-old at the time of the hearing. LCCY offered testimony from DHS caseworker, Ruth Floyd, and DHS social worker, Lenora Truesdale. Mother offered the testimony of Patricia Albright, an advocate

from Every Mother is a Working Mother Network in Philadelphia. Mother did not testify.

Mother's DHS caseworker said she was concerned about returning Child to Mother because Mother is unemployed, has no housing, did not attend parenting classes regularly, and is in a relationship with Father, who has a history of drug use and has failed to work with DHS. (*See id.*, at 58-59, 66). The caseworker also testified that Mother has been the subject of twelve DHS investigations, seven of which were determined founded for neglect and one determined founded for abuse. (*See id.* at 50-53, 77). The trial court found Child to be dependent and committed him to the physical and legal custody of LCCY with a goal of reunification with Maternal Aunt.

The trial court made the following findings regarding the credibility of the witnesses:

> While Ms. Albright was very supportive of Mother, the [c]ourt did not give much weight to her testimony. She was unable to answer any specifics on Mother's progress. The testimony was vague as to updates, goal areas, housing, income, counseling, criminal charges, and generally any particulars of Mother's case—including, how many children Mother had in [DHS] custody. To the contrary, the [c]ourt found [LCCY] and the [DHS] caseworker's testimony to be extremely relevant and informative as to the issues before the [c]ourt. . . .

(Trial Court Opinion 6/05/15, at 5).

The trial court entered its order on April 15, 2015. Mother filed her notice of appeal and statement of errors complained of on appeal on May 7,

2015. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court filed an opinion on June 5, 2015. *See* Pa.R.A.P. 1925(a)(1).

Mother presents the following questions for our review:

> A. Whether the [trial court] lacked adequate evidence that [M]other had a finding of aggravated circumstances against her[?]
>
> B. Whether there was insufficient evidence to support the [trial court's] disposition[?]

(Mother's Brief, at 7).

Our Supreme Court set forth our standard of review for dependency cases as follows.

> . . . [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

To adjudicate a child dependent, a trial court must determine that the child:

> [I]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.] . . .

42 Pa.C.S.A. § 6302.

A dependency hearing is a two-stage process. The first stage requires the trial court to hear evidence on the dependency petition and determine whether the child is dependent pursuant to the standards set forth in section 6302. ***See*** 42 Pa.C.S.A. § 6341(a). If it finds "clear and convincing" evidence that the child is dependent, the court may move to the second stage, an adjudicatory hearing where it must make an appropriate disposition based on an inquiry into the best interests of the child. 42 Pa.C.S.A. § 6341(c); ***see also In re B.S***., 923 A.2d 517, 521 (Pa. Super. 2007). "Clear and convincing" evidence has been defined as testimony that is "'so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." ***In the Matter of C.R.S.***, 696 A.2d 840, 843 (Pa. Super. 1997) (citation omitted).

In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family whenever possible," 42 Pa.C.S.A. § 6301(b)(i), a child will only be declared dependent when he is presently without proper parental care or control, and when such care and control are not immediately available. ***See In the Interest of R.T.***, 592 A.2d 55, 57 (Pa. Super. 1991). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." ***C.R.S.***, ***supra*** at 845 (citation omitted).

In regard to when a child should be removed from parental custody, we have stated:

> The law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, this court had held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.

*In Interest of K.B.*, 419 A.2d 508, 515 (Pa. Super. 1980) (citations omitted). In addition, we have stated, "it is not for this court, but for the trial court as factfinder, to determine whether [a child's] removal from her family was clearly necessary." *In the Interest of S.S.*, 651 A.2d 174, 177 (Pa. Super. 1994) (footnote omitted).

Mother's first issue questions whether the trial court was prejudiced by prior aggravated circumstances when reaching its decision. (*See* Mother's Brief, at 11-15). In her brief, Mother states her concern this way:

> And while it is true that the [c]ourt did not specifically cite aggravated circumstances as a reason for denying [M]other a plan, there was still substantial testimony dedicated to determining if aggravated circumstances did exist. Mother believes that there is a possibility that considering this testimony in the manner that it did, the court was prejudiced against giving [M]other a plan. . . .

(*Id.* at 12). Mother thus admits that the trial court did not make a finding of aggravated circumstances, but asks us to reverse the trial court on the basis that some unspecified evidence regarding aggravated circumstances may have "prejudiced" the trial court. Mother misapprehends the function of a

trial court. The trial court is tasked with hearing the evidence, determining what part of it is relevant and admissible, and rendering a decision. Absent an error of law, or an abuse of discretion on the part of the trial court, this Court is bound by the trial court's findings. **See In re R.J.T.**, **supra** at 1190. Mother, however, does not allege an error or an abuse of discretion here, merely the "possibility" that the trial court might have been prejudiced. We quote the trial court on this issue, with approval:

> Mother argues that the [c]ourt lacked adequate evidence that Mother had a finding of aggravated circumstances against her and that the [c]ourt erred for basing its decision of no-plan on prior aggravated circumstances. Initially, the [c]ourt cannot find any indication that [LCCY] ever requested, in its Petition for Custody or in any other filing, as required under 42 Pa. C.S.A. § 6334(b), that the [c]ourt find the existence of aggravated circumstances. While the [c]ourt believes that the record does establish the existence of aggravated circumstances against Mother, the allegation was not properly before the [c]ourt and such a finding was never made. Mother is incorrect in her assumption that the disposition was based on prior aggravated circumstances. Nowhere in the disposition order does the [c]ourt cite aggravated circumstances as its reason to approve no-plan for Mother.

(Trial Ct. Op., at 6-7). Our review of the record reveals that the trial court is correct when it states that LCCY did not request a finding of aggravated circumstances and that the trial court did not make such a finding. We are unable to find any evidence that the trial court abused its discretion in the way in which it considered the question of aggravated circumstances in this case. Mother's first claim of error is without merit.

- 9 -

In her second issue, Mother questions whether there was sufficient evidence to support the trial court's determination. (*See* Mother's Brief, at 7). In its opinion, the trial court cites this Court's decision in *In re R.T., C.A., K.A.*, 778 A.2d 670 (Pa. Super. 2001), *appeal denied*, 792 A.2d 1254 (Pa. 2001), for the proposition that a trial court's decision to propose "no plan for reunification can be an appropriate decision, depending on the factual circumstances." (Trial Ct. Op., at 6). Mother claims that this cite is not appropriate in that:

> The evidence presented to the court *In re R.T., C.A., K.A.*, clearly demonstrates a failure on the part of parents to remedy the situation and problems that led to placement. The family issues and attempts made at reunification were well documented and confirmed the parents' failings. The matter also occurred in Lancaster County and was well known to the court. In the case of [Child], the testimony of neither the caseworker nor the DHS worker substantiates a failure on [M]other's part to complete a plan, as it did clearly in *In re R.T., C.A., K.A.*
>
> By comparison, in the case of [Child], the evidence does not conclusively demonstrate that [M]other, like the mother *In re R.T,. C.A., K.A.*, has an eight[-]year history of being provided adequate services, and that she failed to comply with those services. While [M]other does have nine biological children, there was no definitive evidence presented at the hearing to conclude with certainty that [M]other failed to meet objectives of a reunification plan, or that she had been provided ongoing services over the course of several years.

(Mother's Brief, at 15). We disagree, and find the differences between the cases to be differences without distinction. In *R.T.*, the agency involved provided services to the parents over a period of some eight years before filing for dependency. *See In re R.T.*, *supra* at 681. In the case before us,

Mother abandoned Child to a family member just as she abandoned her previous and subsequent children. Having abandoned Child, Mother faults LCCY for failing to provide a plan of reconciliation:

> [LCCY] has never provided services to [M]other. Rather, it decided from the outset, and with incomplete information, that [M]other would not get a plan to reunify with [Child]. The [trial court] then improperly denied [M]other an opportunity for reunification on that same incomplete information. Providing [M]other a plan does not mean that [Child] is going to languish in foster care while he waits for [M]other to complete her objectives. [Child] is already in foster care waiting for [Maternal Aunt] to complete a plan. In light of all the foregoing, [M]other should be provided a plan for reunification.

(Mother's Brief, at 15). We disagree and again quote the trial court's analysis of this issue, with approval:

> In reaching its dispositional decision, this [c]ourt found the [LCCY] caseworker and the [DHS] caseworker to be credible witnesses who provided independent, consistent, relevant, and persuasive testimony. The [c]ourt did not find the testimony of Mother's witness to be persuasive. She was vague as to any specifics of Mother's case. Further, Mother did not testify and, therefore, never even offered an explanation for her conduct. She offered no reason for her lack of involvement with [Child]. In essence, she provided no compelling reason why she is more committed to [Child] now than when she left him with [Maternal Aunt] four years ago.
>
> Reunification with the child's family, when possible, is always the preferred permanency placement for a child. The [c]ourt advanced this preference when it approved a reunification plan for [Maternal Aunt], who has been [Child's] guardian and caretaker for the majority of his life. While [Maternal Aunt] is not [Child's] biological mother, she filled that role for three years and, as [Child's] aunt, ensures that [Child] is reunified with the only family [Child] knows.
>
> [Child] has spent the majority of his life in the care and custody of [Maternal Aunt]. It is in his best interest that the

- 11 -

goal of his plan be reunification with the only maternal and parental figure in his young life. Children need love, support, permanency, and stability. For three years, [Maternal Aunt] cared for [Child] after Mother dropped [Child] off at her home. She raised him along with her son. She provided for [Child's] physical and emotional needs. She filled the parental void left by Mother's absence in [Child's] life. To provide Mother with a plan given her history and based upon the record would be a ridiculous and ludicrous exercise in futility. It is the opinion of this [c]ourt, based upon the record and for the reasons placed on the record and as set forth herein, that reunification with [] Mother is not in the best interest of [Child]. [LCCY] should not be required to provide Mother with any reunification services. The primary goal should be reunification with [Maternal Aunt].

The record is quite clear. Mother was not given a plan based on her significant and ongoing absence from [Child's] life and lack of commitment to him. Her history with [DHS] since 2003 and the fact that she has failed to parent any of her nine children is compelling and supports the [c]ourt's action in denying the Mother a plan for reunification with [Child]. The disposition is consistent with the best interest of [Child]. . . .

(Trial Ct. Op., at 8-9) (footnote omitted).

Mother abandoned Child to Maternal Aunt and had no contact with Child beyond occasional phone calls for three years. The evidence to support this fact is undisputed and it supports the conclusion that Mother's abandonment of Child, "place[d] the health, safety or welfare of [] [C]hild at risk[.]" 42 Pa.C.S.A. § 6302. Our review of the record reveals that the trial court's finding that Child is a dependent Child and that his goal should be reunification with Maternal Aunt, the only caregiver he has ever known, is based on competent evidence and that there was no abuse of the trial court's discretion.

Accordingly, for the reasons stated, we affirm the trial court's order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/12/2015</u>